MANN AND OTHERS *against* THE EXECUTORS OF MANN
AND OTHERS.

*Parol* evidence is inadmissible to supply or contradict, enlarge-or vary, the words of a will, or to explain the intention of the testator, except there is a *latent ambiguity* arising-*dehors* the will, as to the person or subject meant to be described ; or to rebuta *resulting trust.*

Where the testator bequeathed to his wife *all the rest, residue, and remainder of the moneys belonging to his estate, at the time of his decease,* it was held that the word *moneys* must be understood, in its legal and popular sense, to mean *gold* or *silver,* or the lawful currency of the country, or *bank notes,* where they are known and used in the market as cash, or money deposited in bank, for safe keeping ; and not to comprehend *promissory notes, bonds, and mortgages, or other securities ;* there being nothing in the will, itself, to show that the testator intended to use the word in that extended sense.

THE plaintiffs, as heirs and residuary legatees of *David Mann,* deceased, filed their bill against the widow and executors. The testator, by his will, dated *March* 9, 1802, after directing his debts to be paid, and a legacy to his niece, *Mary Connel,* to be paid out of his personal estate, devised to his wife, and to her heirs and assigns for ever, in fee, certain lands and real estate, therein described ; and, also, bequeathed to her *all the rest, residue, and remainder of the moneys belonging to his estate at the time of his decease ;* and, also, his negro slaves, horses, stock, furniture, &c., declaring that what he gave to her should be in lieu and bar of her dower; and exonerated his brother, *Michael,* from the payment of all moneys which he should owe to the testator at the time of the testator's decease ; and gave to his niece, *Mary Holford,* 500 dollars, to be paid out of the moneys arising from the sale of the residue of his real estate. The testator also devised to the children of his brother, *Michael,* and his daughter, *Mary,* and to the children of his brothers, *George* and *Matthias,* and their heirs, &c., "*all the rest, residue, and remainder of his estates, real and personal, or*

*the moneys arising from the sale thereof*, equally to be divi-
ded between them, share and share alike." And he em-
powered his executors to sell the residue of his real estate,
&c.; and appointed his wife executrix, *Daniel D. Tomp-
kins*, Esq. *Henry Brevoort*, Esq.; and *James Berian*,
executors of his will. The bill further stated, that the tes-
tator was seized in fee of divers others lands, beside those
devised to his wife; and died so seized, in *July*, 1811, and
possessed of a considerable personal estate, over and above
the moneys belonging to him, and beside the articles be-
queathed to his wife, and the money due from his brother,
*Michael*, viz. bonds, mortgages, and other securities, and out-
standing debts. That the executors have possessed them-
selves of the personal estate of the testator, and have taken
the rents of the real estate before the sale thereof, and of the
other parts of the real estate not sold. The plaintiffs prayed
for a discovery and account of the personal estate, and of
the rents and profits of the real estate, and particularly of
the outstanding debts due to the testator at the time of his
decease.

The defendants, in their answer, admitted the facts stated
in the bill, and made the discovery called for. They stated
that they had sold all the real estate, except the land speci-
fically devised, and had divided the proceeds according to
the directions of the will; that the personal property, exclu-
sive of money, choses in action, and the specific legacies,
amounted to 1,968 dollars; that the testator left in *cash*,
500 dollars, and in *bonds, mortgages and notes*, to the
amount of 13,735 dollars and 80 cents; and that, not only
all the money, but all the bonds and securities, had been al-
lowed to be retained by the widow of the testator, the execu-
tors supposing that they passed to her, under the clause in
the will, devising to her " all the rest and residue of the
moneys belonging to the testator's estate." And this pre-
sented the only point in the cause, namely, whether the
widow is entitled to the securities, under the will, or whe-

ther they do not go, as part of the residue of the estate, to the plaintiff.

Several witnesses were examined on the part of the defendants, to show the intention of the testator.

*Harison* and *Robinson*, for the plaintiffs, contended, 1. That parol evidence was inadmissible to explain the meaning of the testator, and ought to be suppressed ; and, to this point, they cited *Talbot's Cases*, 240. *Brown* v. *Selwyn*, and n. 2 *Freeman's Rep.* 62. *Str. Rep.* 1260. 2 *Vesey*, 217. 4 *Vesey*, 616. 2 *P. Wms.* 420. 3 *P. Wms.* 51. 353. 4 *Bro. P. C.* 180. (old edit.) 1 *Atk.* 558. 2 *Atk.* 373.

2. That the word " moneys" does not include *choses in action;* and to this point were cited 1 *P. Wms.* 575. 579. 1 *Eq. Cas. Abr.* 201. 2 *Vernon*, 688. 747. *Ambler*, 641. *Bac. Abr.* tit. *Legacy*, (B. 3.) 1 *Vesey*, 187. 273. 3 *Atk.* 232.

*T. A. Emmet*, contra, insisted, that the words, " rest and residue of the moneys belonging to the estate," meant something more than the *cash* in hand at the time of the testator's death ; that it had been decided in *England*, that *bank notes*, in the desk of the testator, would pass as *money*, and that was a step gained, for they are *choses in action ;* and that money *in bank* was held to be included under a bequest of *money*, which was another step gained in favour of the construction given by the defendants to the will.

THE CHANCELLOR. The question here is, whether, under the bequest of " all the rest, residue, and remainder of the *moneys* belonging to my estate at the time of my decease," the widow be entitled to any thing more than the cash which the testator left at his death ; or whether, as the defendants have contended, she be entitled also to the bonds, mortgages, and notes ?

1814.

MANN
v.
EXECUTORS
OF MANN.

This question has led to another, and that is, whether the parol evidence offered be admissible to explain the testator's meaning ?

It is a well-settled rule, that seems not to stand in need of much proof, or illustration, for it runs through all the books, from Cheney's Case (5 Co. 68.) down to this day, that parol evidence cannot be admitted to supply or contradict, enlarge or vary, the words of a will, nor to explain the intention of the testator, except in two specified cases ; 1. Where there is a latent ambiguity, arising *dehors* the will, as to the person or subject meant to be described ; and, 2. To rebut a resulting trust.   All the cases profess to proceed on one or the other of those grounds. (*Hodgson* v. *Hodgson*, *Prec. in Chan.* 229.   2 *Vern.* 593.   *Pendleton* v. *Grant*, 2 *Vern.* 517.   *Harris* v. *Bishop of Lincoln*, 2 *P. Wms.* 135. *Beaumont* v. *Fell*, 2 *P. Wms.* 140.   *Hampshire* v. *Pierce*, 2 *Ves.* 216.   *Urich* v. *Litchfield*, 2 *Atk.* 372.   Lord *Walpole* v. Lord *Cholmondelly*, 7 *Term Rep.* 138.   Lord *Eldon*, in *Druce* v. *Denison*, 6 *Ves.* 397.)   If there be a mistake in the name of the legatee, or there be two legatees of the same name, or if the testator bequeath a particular chattel, and there be two or more of the same description, or if, from any other misdescription of the estate, or of the person, there arises a latent ambiguity, it may and must be explained by parol proof, or the will would fall to the ground for uncertainty.   When a latent ambiguity is produced, according to the language of the courts, (Lord *Thurlow*, in 1 *Ves.* jun. 259, 260. 415., and Lord *Kenyon*, in 7 *Term Rep.* 148.,) in the only way in which it can be produced, viz. by parol proof, it must be dissolved in the same way ; and there is no case for admitting parol evidence to show the intention upon a latent ambiguity on the face of the will.   They are all cases of latent ambiguity ; and the objection to supply the imperfection of a written will, by the testimony of witnesses, is founded on the soundest principles of law and policy.   " It would be full of great inconvenience," say the justices, in *Cheyney's*

*case,* " that none should know, by the written words of a will, what construction to make, or advice to give, but that it should be controlled by collateral averments out of the will." And if collateral averments be admitted, to use the words of Sir *Matthew Hale,* in *Fry and wife* v. *Porter,* (1 *Mod.* 310.,) " how can there be any certainty ? a will may be any thing, every thing, nothing. The statute appointed the will to be in writing, to make a certainty ; and shall we admit collateral averments and proofs, and make it utterly uncertain ?" In a still later case, (3 *P. Wms.* 354.,) Lord *Talbot* observed, that if we admit parol proof, " then the witnesses, and not the testator, would make the will ;" and he spoke with equal decision in the case of *Brown* v. *Selwyn,* (*Cases temp. Talbot,* 240.,) though the parol proof, in that case, would have left no doubt of the intention of the testator being contrary to the legal operation of the will. This case comes with the more weight since the decree was affirmed in the House of Lords, (4 *Bro. P. C.* 179.,) who would not suffer the parol evidence to be read, nor even the answer as to that matter.

Perhaps a solitary *dictum* may, occasionally, be met with (for there are volumes of cases on the subject of wills, *immensus aliarum super alias cumulus*) in favour of the admission of parol proof, to explain an ambiguity of uncertainty appearing on the face of a will ; though Lord *Thurlow* says, there is no such case. If there be, we may venture to say, it is no authority. If a will be uncertain, or unintelligible on its face, it is as if no will had been made ; *quod voluit non dixit.* We ought not to forget, that no verbal or nuncupative will is good, within the statute of frauds, except under special circumstances ; and that no will concerning any personal estate (and of that we are now speaking) shall be revoked, or altered, by any words, or will, by word of mouth only. (*Laws,* sess. 36. ch. 23. sect. 14, 15, 16.) The only apology for parol proof, in any case, is the necessity of the thing, because the ambiguity is

so complete as to elude all interpretation, and would destroy the devise altogether, unless explained. But here is no such difficulty, and no such necessity for resorting to parol proof. The word *moneys* will apply, beyond all doubt, to the cash which the testator left at his death ; and the bequest has, at all events, a certain and definite subject on which it can operate. In the late case of *Doe* v. *Oxenden,* (3 *Taunt. Rep.* 147.,) the court of C. B. considered this fact as a very material circumstance, and one which made the case to differ from all others on the subject of explaining a will by parol proof ; because, in all cases that had been before, the evidence was admitted to explain a part which, without such explanation, could have had *no operation.* But in that case, as there was sufficient to satisfy the devise according to the ordinary meaning of the description, collateral evidence, to show that the testator meant to use the description in a more extensive sense, was rejected. There was a similar decision in *Doe* v. *Brown,* (11 *East,* 441.,) and the two cases are strong in respect to this point.

My conclusion is, that the parol proof cannot be received or permitted to enter into the consideration of the case ; for it will readily be admitted, that to serve the particular purpose, or meet the supposed hardship, of an individual case, we ought not to break in upon the established principles of law. The observation of Lord *Talbot,* in one of the cases referred to, contains the true and wise doctrine on this subject, that *it is better to suffer a particular mischief than a general inconvenience.*

The only question, then, in this cause, is on the construction of all the will itself.

I do not perceive, from a perusal of the will, any reason for construing the word *moneys* beyond its popular and legal meaning. It means gold and silver, or the lawful circulating medium of the country. (*Co. Litt.* 207. a.) It may be extended to bank notes, when they are known and approved of, and used in the market, as cash. Perhaps it would be

proper to extend the term to money deposited in bank, for
that is cash, and considered and used as cash placed there
for safe keeping, in preference to the chest of the owner.
It was mentioned by the counsel, in the recent *English*
case of *Hotham* v. *Sutton*, (15 *Vesey*, 319.) that, under
a bequest of "money," money and bank notes, in the pos-
session of the testator, or at his banker's, will pass, and *no-
thing else;* and they said it had always been so considered;
and the Chancellor observed, that stock never passed by the
word money. Beyond these bounds the word cannot be
extended, unless it be accompanied with explanations show-
ing that the testator alluded to other property than his cash,
and defining that property as money at interest, on bond and
mortgage, or money in the public funds. If he uses the
word absolutely, without any such accompanying qualifica-
tion, or reference, it cannot be construed beyond its usual and
legal signification, without destroying all certainty and preci-
sion in language, and involving the meaning of the will in great
uncertainty. The difficulty would be to know what precise
check to give to the force of the term, after we have once
moved it from its seat ; *vires acquirit eundo.* Shall it be
confined to any particular species or description of choses
in action ? or shall it embrace, promiscuously, every species
of debt and security—book debts, notes, bonds, mortgages,
judgments, turnpike, manufacturing, insurance, bank, and na-
tional, stock ? or must we go into a difficult inquiry to ascer-
tain which of these securities was taken for cash lent, and
which for goods or lands sold, or services rendered, and which
as a compensation for torts or other causes of action ? It ap-
pears to me that it would contravene the rules of law, and the
policy of the statute, and be of dangerous consequence, to
depart from the common and fixed meaning of the word
moneys, and which meaning the testator must be presumed
to have understood; especially as the bequest will still
be effectual and productive. The cases of *Rose* v. *Bartlett*,
(*Cro. C.* 292.,) and of *Day* v. *Trig*, (1 *P. Wms.* 286..)

1814.

MANN
v.
EXECUTORS
OF MANN.

MANN
v.
EXECUTORS
OF MANN.

may be cited to show, that where a will can have effect, words are not to be strained to enlarge the will; and that a lease for years will pass, under a devise of *all my lands*, if the testator had no fee simple estate; and this, in order to prevent the devise from being void; but if he had an estate in fee, the chattel interest will not pass. The testator, in the present case, understood how to explain the word moneys, when he meant to designate other property than his cash in hand. He uses it, repeatedly, in the subsequent parts of the will, but it is always with a clear and certain reference to the subject matter to which it is to be applied; as when he discharges his brother *Michael* " from the payment of all moneys which he shall owe me at my decease;" and when he bequeaths to the children of his brothers the remainder of his estate, " or the moneys arising from the sale thereof."

There is a settled distinction, on this subject of the construction of wills, between cash or money, and choses in action ; and this increases the difficulty of the attempt which has been made to confound them. Thus, cash will pass by a bequest of moveables; but the better opinion, according to *Godolphin*, (*Orphan's Legacy*, p. 417. s. 9.,) is, that money at interest will not so pass, because it is a debt, and not cash. So, a devise of goods and chattels, in such a place, will not include a bond being there, as it has no locality ; but it will include cash, and also bank notes, because they are considered *quasi* cash. (*Chapman* v. *Hart*, 1 *Ves.* 271. *Moore* v. *Moore*, 1 *Bro.* 127. *Fleming* v. *Brook*, 1 *Schoale & Lefroy*, 318.)

Nor is there any reason to infer, from the will, that due provision is not made for the widow, without permitting her to sweep away, under the denomination of money, all the notes, bonds, and mortgages belonging to the testator. The testator gives to her, in fee, his dwelling house and six acres of land lying on the *Bowery-road*, in the city of *New-York.* He also gives to her, in fee, two other lots in the same place.

containing an acre and a half; and he further gives her all his household furniture, horses, farming stock, &c. The expression of all the *rest, residue, and remainder* of the moneys, &c. *belonging to his estate*, leaves the question of construction precisely the same as if those words had not been used, for the question still occurs, what were his *moneys?* The words *rest, residue,* &c., seem to be without use or meaning, as there used, for there were no moneys, previously alluded to, except the 1,000 dollars bequeathed to his niece, *Mary ;* and that sum was to be paid, at large, out of his *personal estate ;* and it is not contended that the word " moneys" can have such an extensive sense.

The result of my opinion is, that the executors must account to the plaintiffs for the bonds, mortgages, and notes left by the testator ; and a reference must be made to a master, to take and state an account between the parties, in which the defendants must be allowed for whatever payment and expenses are justly chargeable to the property ; and be chargeable with all the securities aforesaid ; and the question of costs, and all other questions, to be reserved until the coming in of the report.

Decree accordingly. (a)

*1814.*

MANN
v.
EXECUTORS
OF MANN.

(a) This case, which was decided the 27th of *September,* 1815, has been printed out of its chronological order; it should have followed the case of *Woods* v. *Monell, (post,* p. 507.) The error, however, is not deemed of sufficient importance, to compensate the trouble and expense of correction.